Our first case for argument today is 24-2150, FOX Logistics and Construction v. United States. Counsel, please proceed. Thank you. Judge Post just reminded me that I'm supposed to, as I always should, acknowledge that we have the help and support of Judge Seaborg. He's a district court judge here who's sitting with us by designation. So thank you so much for your time. I appreciate it. May it please the court. My name is Hal Emelfarb. I'm the attorney for FOX Logistics and Construction Services. FOX was a subcontractor in this case to Lakeshore, a general contractor working for the Air Force. From 2012 and 2013, my client basically was a subcontractor. At the end of 2013, this general contractor, though paying my client slowly from the general account, turned out to basically write a letter when my client was looking for payment on $3,500,000. And what happened was the general contractor wrote a letter to the contract officer, Rebecca Bann, and said, I'm broke. I have no money. I cannot proceed. I'm in violation of 49 other contracts that are bonded. My general account is basically under I no longer can perform or pay for any work. I suggest if you'd like to proceed, go ahead and take an assignment of my money, give it to the subcontractor, let him stand in my shoes, and proceed. That's what occurred. The trial court interpreted this transaction as being normal and usual in construction. While I admit the beginning of construction, when we were slow and getting paid slowly, that's usual and typical. When your contractor is a prime who's not bonded, says I'm broke and have no money, that's not typical if you want to continue. And we've seen a number of these cases, and there's sometimes circumstances that cry out for relief. The question for us is what kind of relief is there an entitlement to in these circumstances? So what in the record indicates that the Air Force intended to assume responsibility for Lakeshore's debts to you, the subcontractor? Okay, well, we weren't really looking for responsibility of Lakeshore's debts, but we were standing in his shoes. What the contract officer did was investigate, as she should, the status of what went on. They had a PowerPoint meeting, and they basically assigned the money into a special account. Originally, there was a general account that was closed down with the financial problems that they had with the sureties. So they had to either terminate my client, my client asked them to be terminated, please, if we can't get paid directly or some other mechanism, we can't continue working. So when we said this to the contract officer, she went ahead and had a meeting, made a PowerPoint meeting, was very specific, it's in the record, and says that we will assign all the money to you, and I'm going to get nothing. She approved that. She ended up creating a memo. On January 13th, her assistant, Laura Schoenberger, shows up and says, are you sure you want to proceed? Do you realize what an implosion this contractor has? DFAS says we're offsetting accounts. We have a negative accounting. So we walked into basically a black hole, and the contract officer, while she says in some of her testimony, I have to admit, I don't really intend to benefit the subcontractor. She was well informed by the Air Force Council, or she believes that. She was a hero, as far as I'm concerned, because she's opened up a bank account in a war zone, and there were 2,000 people working there, and they needed this Air Force done. So we stood in the shoes of the general contractor, and we basically were told by the contract officer directly and her assistants, we dealt primarily with the contract officer. Everything we were talking about, the contract officer participated. Isn't, though, the problem that you have that still the relationship was to Lakeshore, the government to Lakeshore, and you may have been out in the ozone there, but there was never a point at which there was a direct payment, for example, from the government or invoicing from the sub to the government. Well, okay. So what happened specifically to your point is first, let's look at the law of FlexFab, and FlexFab basically says that you can have an indirect payment, okay, paid to you as long as the contract officer directly intends to benefit you by the facts. But in FlexFab, wasn't there an actual structure whereby it was payment directly to the sub? No. What happened there, Your Honor, in the FlexFab case in 2005 was they denied the sub because they said the contract officer wasn't knowledgeable about the facts because you have to deal with the contract officer. In the 1996 FlexFab case, the mechanism that you're referring to was that they mailed the check, paid to the general contractor to the subcontractor's address. So in fact, they didn't do that. That's why they sued. I think they called it in subsequent cases, they referred to it as some sort of direct payment, which is lacking in this record, is it not? No, no, it's not because in this record... Were there any direct payments here from the government to the subcontractor? Okay. Well, no, in the case of FlexFab, it didn't go to the subcontractor. The check was made out to the general contractor. The subcontractor just possessed it and was able to sign for it by an agreement with them. That was a similar analogy that we have over here. What here was, the fallacy in what the trial court's opinion is to say everything's normal is that there's a general account that normally is commingled with all the money. And then when you have the right to be a creditor or beneficiary, there has to be a change of the payment mechanism, to your point. And in changing the payment mechanism, they created a special account. My client said, you have to be able to control that account and control the disbursements so we don't have the problem where the general contractor can continue taking the money away. So they took a restricted account. So if you look at the general account, thousands of transactions. If you look at the special account, 12 transactions. And there were three task orders, 32, 35, and 42. 42, which we're on, they took the money and they put it in there and then we got paid directly out of that account. That we got paid in addition to the special account sitting there with letters of direction and wire transfers. So when the money was paid from the contract, from the Air Force DFS to the contractor, it went into the special account. It didn't go into a general account. They basically took the money from the special account and they had wire transfer instructions pre-arranged and sent over to my client. When you say they, you mean Lakeshore? With the government and Lakeshore and my client all expected the money never to touch Lakeshore. Lakeshore had 100% of the money assigned to us. They're entitled to zero if you look at the facts of the case. Zero. And all the letters, all the agreements, all the payment agreements, they all talked about putting money into a segregated account. Once you put money into a segregated account, then it becomes identified. You're directly benefiting, intending to benefit. Control of the account. Say again? Who had control of the account? Basically, Lakeshore had ministerial control. They had no right to any money to the account. They were banned from taking money. If they deviated in a second, the contract officer would terminate them and the letters of direction were there. That controlled the disbursement. Okay. In fact, on the first payment that went out, it actually went to the wrong account. It went to the general account. Because of these restrictions, they put the money back into their special account as was intended and it flowed through. So this was nothing more than one of those 49 other contracts that were in default by Lakeshore where the surety comes in and does a funds control account. This is the equivalent of a funds control account because the money is earmarked. If you actually look, which you'll have a chance to do when you look at the appendix and the record, the bank statements talk about every dollar that went in, 100% of the money went out to 42, which is my client, for $4,050,000 and then the five other 32 contractors and subs for $550,000. You can see the money coming in and see the money going out. Lakeshore didn't put a dollar after he was in default on December 31st. He didn't put a dollar in. The judge made a decision in his trial court saying, hey, every 30 days you got to pay your employees. Well, who do you think paid the employees? It wasn't the contractor that had no money. The contract officer and Lakeshore had my client step in the shoes of Lakeshore. He wasn't a vendor. We had the whole contract with 2,000 employees sitting there. So as a result of that and standing in the shoes, we basically took a situation where on a restatement 302, which we've alleged in the brief, there's a situation where when the government has a contractor and the government knows the did here and expects to get paid and the contract officer knows that we expect to get paid. Well, the contracting officer knows every sub expects to get paid. That's not special. No, no. Okay. It's not that expects to get paid from the, how does Lakeshore, who has no money, contract officer has no money, has the money. Lakeshore has zero. It says I'm broke. I don't have a penny. Nobody expects to get paid by Lakeshore. That was the, that wasn't, they're insolvent. But you asked the, you, your company asked the Air Force to take over control of this account and distribute the funds and the Air Force declined to do so. No, they actually took the control and the disbursement and put in their letters of direction, monitoring and tracking the dollars that came in and came out with wire funds. The Air Force just settled for monitoring rights. They declined your request to control. And show me in the record. Okay. Show me in the record. I, I can't. Now. All right. All right. Your Honor, in the record, um, we have letters of direction. I think, let me just see if I can find this. First of all, in the record, we have like, um, in, um, 31, let me find the record for one second. There's a letter that went out from the, um, from the, um, Lakeshore to Department of Financial Accounting Services. It says this account is opened up exclusively to benefit the subcontractors. The judge says, well, you have no proof of that. We do have proof of that. But that's not what I asked you to show me. No, no, I understand. Okay. Then within that letter, within those letters, the same letters we're talking about, there's letters of direction that have wire transfers. It has TO-42 on there. And when the money comes in, the sub, the GC cannot have any control whatsoever. It's 100% coming in, and then 100% wire transfer coming out. So there's no control other than ministerial. I'm not going to waste any more of your time, but perhaps on, on reply, you could actually identify for me a site that corresponds to what I've asked for. Yeah, when I rebuttal, I'll get it for you, Your Honor. But before then, I want you to address the second point, because you have to prevail on both points. You have to prevail, prevail on the third-party beneficiary question. You also have to prevail on the breach question. And the question associated with breach I have for you is, how is the government in breach? If Lakeshore never invoiced the government, and therefore the government did not fail to pay an invoice properly received, what did the government actually do that amounted to on behalf of the government? That's a, that's a very good question, Your Honor. So when we're arguing the motion to dismiss, Judge Wheeler asked the judge and Judge Meyer, what, what did you do with this? We had the invoices. We didn't know what to do because of bankruptcy, and we just did nothing, basically. So, you know, we, we basically expected them to go forward and, and go for it. And the contract officer had our pay application invoices in their possession, and they admitted both to the trustee in bankruptcy, and on the record with Judge Meyers during the motion to dismiss hearing, that, that they had it and they couldn't explain it. In fact, to your point, they didn't pay the money to the trustee. No, but I don't, I don't know how I can hold somebody accountable for not paying something that they were never invoiced for. They were invoiced. Well, they, they were invoiced in the sense that they got notice, but they didn't get an invoice from Lakeshore, did they? Yes, they did. Oh, they did, Your Honor. They have, they have three pay, three or, two or three pay apps that weren't, that weren't paid. On, on your rebuttal, can you identify and show us those in the record too? Because that's not my understanding of the record. So I want to see these things with my eyeballs. Yes, Your Honor. Okay, so on rebuttal, do that. All right. Thank you. Thank you, Your Honor. Here for Mr. Dillingham. Oops. Thank you, Your Honor. May it please the court. The law draws a line between contractors and subcontractors and their primes on one side, subcontractors on the other. The question here is that Captain Rebecca Ban, the contracting officer, erased that line. The judge below went through a very careful analysis of emails between Mr. Habibi, representing Fox, and the government representatives between approximately December of 2013 and late January of 2014, where Mr. Habibi was continually insisting that he did not trust Lakeshore, that he wanted the government to take control of the special account and to guarantee payments to Lakeshore. As Captain Ban testified, and as the record makes amply clear, she refused to erase that line, and the expectation she had and that standoff she maintained is required to be respected by the law. Your friend relies heavily on FlexFab. What's the difference between that? Right. So FlexFab and others like, there are certainly cases where the court has recognized that the contracting officer has demonstrated an intent, which is, of course, the contractors are the plainest burden to show. So FlexFab is one of those cases. As Mr. Amelfarb said, in that case, the court did not ultimately allow the payment for the suit by the subcontractor because there is no evidence that the contracting officer actually knew about it. That's how important the facts are in these cases, and that's how important the intent expressed by the contracting officer is in these cases. So in that case, there was, payments were being indicated as being remitted to a certain address, post office boxes. There was another document that showed that. Was there a direct payment from the government? Well, the idea was that, well, the payment addresses were ones that we controlled, as I understand it, by the prime contractor. Mr. Amelfarb says, and I won't dispute him, that somehow those checks wound up in the hands of the subcontractor. But all that I've seen in the record in reading that decision is at some point there was a reference to FlexFab as performing via site of performance and the site of inspection. There were discussions with the contracting specialists, with the contractor who was, I guess, eager to make sure that FlexFab was satisfied that it would get its hands on the money ultimately. Isn't, though, the establishment of the special account, isn't that indicative of an intent to benefit the subcontractor in the sense that you wouldn't have an account like that that's protected from the general, if you will, unless you're trying to do something for the subcontractor to make sure the subcontractor gets paid? Well, certainly we want the subcontractor to get paid because if they don't get paid, they're not going to work, and that's a feature of every contract. But as this court held in G4S, this was the one involving the rural utility service, and the contract required that the contractor establish a pledged deposit account. The contractor there or the plaintiff made the exact same argument that Mr. Amelfarb has just made, which is to say, when the government opens up a special account so that I can view what's going on with the subcontractors, that amounts to intent, and it does not. The distinction this court has drawn in cases like D&H and FlexFab, except for the fact the contracting officer didn't know about it, and JGB, are when the contracting officer agrees with the promisee, with the counterpart contractor, the prime contractor, to pay someone else. The contractor is, the government is bound by that promise. It's a contract promise and can be invoked by the subcontractor to say, you've made a promise to pay me. Here, there was no promise to pay at all. There was simply this arrangement. There was a promise to pay in exchange for work done. Now, you're going to say the promise was Lakeshore, correct? Right. Okay, but the work got done, correct? Why haven't the government paid somebody? Well, first of all, the promise to pay for work done, the work was done, why hasn't the government paid someone? Because the promise is to Lakeshore. Lakeshore has a responsibility to make sure the work is performed, to review the invoices, to satisfy itself, and to certify that work has been done. You just said the work was done. Is the work not done? Was the work not done? Certainly the work was done and the government paid, as the trial judge recognized, over $3.5 million on invoices that were submitted. When invoices were not submitted by the contractor, it has a responsibility to ensure the work is performed to the standards in the contract and then certifies subcontractors have been paid. Then and only then is the government responsible under the contract to pay. But you don't dispute that the government was aware that the work was being done because FOX did provide information that they had done the work. You're just saying it didn't come in the form of a Lakeshore invoice and therefore you didn't have to pay. This is not an argument. Yes, is the answer. This is not an argument of form over substance. There are responsibilities placed on the contractor who is on that side of the line I've talked about with the government. Until those responsibilities are performed, the government has no responsibility. In the arrangement, which is on page 2095 and 2096, that Rebecca Ban, the contracting officer, Captain Ban, accepted the idea of this special account, she made clear against all of the requests of FOX to the contrary that I will establish a viewing account and specifically said it is Lakeshore's responsibility to make those payments and Lakeshore, if it does not, it will be terminated. It's Lakeshore's responsibility. There were four, I think, invoices specifically referenced as the trial judge showed on page 19 of his decision. Those invoices came in and they were paid into the special account. Absent further invoices, further recognition and management by the prime contractor that work has been done, the government simply has no responsibility. So there are certainly allegations in letters and Mr. Amelfarb has made allegations, but until something comes across the contracting officer's from the prime contractor certifying the work is done and that the subcontractors, not only FOX, hasn't been paid, the government simply has no responsibility. What it agreed to under the special payment circumstance was to entertain... Boy, this is going off. Aren't you worried this is going to have a chilling effect on contractors? I mean, we have a contractor who really undisputedly has performed work for which the government should be remitting payment. It does feel like a form over substance thing because the middleman, the general contractor, didn't certify an invoice for payment. So are you not worried this will have a chilling effect on contractors and the ability of the government to actually get contracts performed when you have this sort of situation? Well, this is a consequence of the law and choices that Captain Bann and the contracting people chose under the existing law. They're entitled to the expectation the law provides them. The law has always been clear. If you want to talk about bad circumstances, think about cases where a contractor provides a service to a government official, say a project official, and the government's defense is, well, that person wasn't a contracting officer. And the law makes clear in case after case, you have to be sure you're doing it. To be clear, I actually agree with you that that is a ridiculously unfair situation. But the fact that there's one ridiculously unfair situation doesn't really mean we should have a second one. I'm not sure when you start with if you want to really see something bad, let me tell you about this other thing that's really going to successfully persuade me this isn't bad. It's no different. The law is plain in this circuit and by the Supreme Court in cases like German Alliance that you simply can't cross that line without the contracting officer specifically intending by examination of documents or circumstances indicating that the contracting officer intended to pay the contractor. Every contracting, every contractor, whether it's an owner in a private contract or the government and the government contracts is entitled to the benefit that the law clearly provides. I know, but I'm thinking this case is very close to a line. There's case law, I feel like there's case law on both sides of this line right now. And this case is the closest I've seen to the line because you have the contracting officer recognizing the need in order to have the contract be continued to be fulfilled that a separate account needs to be established for the benefit of the subcontractors. That was the purpose. The contracting officer clearly had a clear mind that the subcontractors needed to be protected and that Lakeshore wasn't ensuring that would even though ultimately the reason the government cares, they don't necessarily care about Fox, but they care about getting the job done and making sure the job continues. But I'm not sure that doesn't mean that they aren't third-party beneficiaries in a case like this where a separate account is created exclusively for their benefit with recognition that the prime contractor isn't competent to manage the job. But that line exists in the law that's no different than the pledged deposit account in G4S where the court specifically said the government's interest in making sure the funds are spent wisely, the projects proceed. This is something that's always been on the side of the line that the government took here and the trial judge agreed that the government was safely on the side of. Anytime we draw lines, there's going to be people close to the line. There's no question about that. I think the case law stands firmly for the proposition that line exists unless there's specific intent. Mr. Amelfarb cannot identify anything and what he says is the accepted offer, which is the February 7th letter by Captain Bann who basically made deliberate choices saying I am interested in making sure this project progresses. So obviously contractors have to be paid. In fact, the final invoice, I'm not sure who was underneath that, but when the final invoice or came in and the contractor specifically said I've got no evidence you're paying your subcontractors, I'm not going to pay this. That's a separate responsibility of the prime contractor. So in terms of what work has been done, there's no question they were working and I think most of the work here was sort of half to the fact. This was very close to the time where the United States left Afghanistan. The project was closed down in May 2014, very close to all the correspondence that went back and forth between Fox and the government begging, trying to drag the government into its side of the line and they abandoned the project, went bankrupt, and the project to simply cease to exist. So what Fox said is, well, we're still storing equipment and so forth. Sorry, Fox filed some sort of claim against the contractor, right? So they went into bankruptcy is my understanding, right? Those were all sorted out in bankruptcy and the contracting officer's final decision says that. It says, look, this has all been sorted out in bankruptcy. I don't have a contractor to deal with anymore. So whatever you got from the bankruptcy court, you got, you know, companies, I hate to say it because I know that there's record evidence that Fox did a good job and the contracting officer and others specifically praised Fox for the work it was doing. What specific work it did that was not either certified or inspected or available for payment, I can't tell you, but everything that was promised, the government promised to pay for, specific invoices were paid as the trial judge found on his very close examination of the record. So there's just some differences between FlexFab in this case, for example, the direct mailing of the checks, the authority to cash. So FlexFab is their best case and there are some differences between this case and that one. Your best case is G4S. With G4S, there's differences between G4S and this one. G4S focuses repeatedly on how this was served as a mechanism to guarantee, in our case, the subcontractors were paid. That's what was said here. There's nothing like that in G4S. G4S was a general fund and the reasoning there did not mirror the reasoning here that the contractor gave. That's why I consider this case very close to the line. There's two important differences, one between their case and this one and one between your case and this one. So I'm trying to figure out where that middle ground. So G4S had this pledged deposit account and the court there said the reason the money goes in there is so the contracting officer or the project people, the contracting officer, can be satisfied that work is progressing, that money is being spent properly and so forth. Here's what G4S says. Rather than to serve as a mechanism to guarantee the subcontractors were paid, the purpose of the PDA was to assist the government in reviewing and approving costs of the project, whether or not they were related to subcontractor work. That is clearly disentangled from the need to ensure subcontractors are paid so work continues. Here, in contrast, there are expressed statements that directly contradict this important sentence in G4S about what that fund existed for. Here we have statements from the contracting officer about the intent of creating this fund and the mechanism for supervision of it and it was all about ensuring subcontractors get paid. So this is why I'm very, I find it a very hard case on what to do with the third-party beneficiary status. G4S looked for a couple of things. First of all, looked for a clear intention in the various agreements and it found none. And second of all, look for subcontractor control over the payments and it found none. And the same is true here because this went into a Lakeshore account. The subcontractor simply cannot go into that account. For the very same reason, the court focused on the pledged deposit account in G4S and said this is simply for the government's proper administration of the contract. That's exactly what Captain Band was doing here and that's why the FAR clause requires contractors to certify their contractors have been paid. That's why it's important to the government because if they're not, I'm going to guess that many contracts, if not most nowadays, are performed by subcontractors. We know all the big names, CACI and so forth. How many of those contracts are actually being performed by their people as opposed to being subcontracted to others? I work with GSA every day. I understand what you're talking about. So there you go. And so it's the nature of the beast that subcontractors are performing the work. But what's important here, if you think the line is closed, first of all, recognize that this is a matter of sovereign immunity. German Alliance case said that. Cases have said, like JGB, the contractor has to show clear proof of intent. So if nothing else, the burden of proof alleviates any concern over how close this case may be, especially when sovereign immunity is at play. And that's why in German Alliance and other cases, the court has said it's an exceptional privilege to do this. Mr. Gillingham, I think we have your argument. Okay. Thank you very much. Thank you so much, Your Honor. Thank you. Your Honor, I cannot find the testimony in the motion to dismiss hearing that we had. I can represent to the court. Steve was not at that hearing, so he can't represent it. There was a young lady representing the Department of Justice, but I can represent to the court and I'll get the record that says, Steve, in your satisfaction, when I am able to have a little bit more time to find it, and basically ask the question, can you explain, Judge Wheeler said, actually, Judge Meyers said, why payment wasn't made and what was the reason? And there wasn't invoices pending. And there's also work in process pending that we're in the process of being done, which is pled in the complaint as well. But that's not Lakeshore's payment app. I don't have any information other than the invoices that were pending at the time were not paid. And my client, I remember him testifying, said that the trustee said that there was an invoice outstanding after the bankruptcy occurred. And he was trying to get the money and we said he couldn't have it because it belonged to us and never got paid to anybody. I mean, I think one of the arguments made in this case is that there were no invoices, which the government refused to pay and therefore the government's not in breach. I have not seen any evidence in this record that was produced to us that contradicts that statement. And so I will give you, if it's okay with my colleagues, you know, till the end of the week to supplement the record with consent of the government, if there exists record evidence, not outside the record below, obviously, you're not going to bring in new evidence, but record evidence that was simply absent from the appendix. Okay. Let me see what I can find, Judge. And by the way, thank you very much. That's okay. Move on to the other argument, which I want you to address for me. And of course, if my colleagues have questions, but for me, you heard my colloquy back and forth with Mr. Gillingham about the closeness of this case and the third party beneficiary status for me, which by the way, is irrelevant if you really don't have invoices, but you know, so, but, but close to the line for me between whether this is a third party beneficiary case, you saw, I had some differences between your best case, which is FlexFab and this set of circumstances. There are also some differences between G4S and this set of circumstances. Why don't you try to address that for me? Thank you. Thank you, Your Honor. Okay. I'm very familiar with the G4S case because that case has been around since the beginning and G4S, the rural area organization, when the contract bid was awarded to expand the telecom within the rural areas, they basically had an existing investment in depository accounts for which they pulled money when they got invoiced. Larry Weiner, who was the attorney for G4S, basically, I listened to his oral argument before this court and he expressed he didn't feel he needed in G4S a special bank account, a change of payment mechanism, because he thought that that payment mechanism in G4S was for the benefit of the subs. Okay. But so, so, but you're now telling me a lot of stuff about G4S that isn't in the opinion. I need you to focus on the law because I have to decide whether this case is more like G4S or more like FlexFab, not based on your personal knowledge of the opinion, but based on what the court said about how the facts were considered relevant to this question impacted third-party beneficiaries. Thank you. So in G4S, there was not a change of a payment mechanism. And when there wasn't a change of a payment mechanism, the general account was paid directly by the government. That was G4S. There was not a change of payment mechanism. In our case, the general account disappeared and the special account showed up. That's the big difference factually. The law, however, Your Honor, says in there that G4S expects something when you look at what is the change of the payment mechanism, because that's where we get back to FlexFab is the payment mechanism as well. That's where these two connect. In G4S, it said it has to be something more than a general account. So if you're getting paid from a general account to the general contractor and there's no change of a payment mechanism, there's no change of a payee designation, then you're right away dead because that would allow everybody to go. You have to show contract officer intent. Where the contract officer intent here comes from is that if you look at her testimony, which is part of the record, she testified that she had no other choice but to have Fox finish the project because there was nobody else present or able to go do it. And she couldn't fire the contractor because if she did, she'd have nothing to show and the contract investment would be bad for the government. So she made the decision. And when she made the decision, she attended all the meetings where she saw the new payment mechanism with a special account. She restricted the money 100% to Fox, zero to Lakeshore. They had the letters of direction that were there that we talked about before. And she put in basically, there's a word called oversight, which is usually used in a typical situation. But I don't look at this as oversight because once the contractor basically was insolvent and defunct, you can't have oversight of a person that doesn't exist because he has no investment in the process. It's a shadow of a person. It's ministerial. He was though the general contractor. They did not terminate him. Counsel, we are well beyond your time. I thank both counsel for their argument. This case is taken under submission. Your Honor, thank you very much. Thank you. We get a chance to, such a great chance in this court to give our argument. Compliments are always welcome. Thank you. This is my first appeal. Thank you, Judge. Not to be outdone. I appreciate your input.